## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JASMATIE R.,

    **Plaintiff,**

**v.**

**ANDREW SAUL,** *Commissioner,*
*Social Security Administration,*[1]

    **Defendant.**

**CIVIL ACTION FILE**

**NO. 1:19-cv-03541-AJB**

## ORDER AND OPINION[2]

Plaintiff Jasmatie R. brought this action pursuant to § 205(g) of the Social

Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of

the Commissioner of the Social Security Administration ("the Commissioner")

denying her application for social security disability insurance benefits ("DIB")

---

[1]    On June 17, 2019, Andrew Saul was sworn in as the Commissioner of the Social Security Administration.  Under the Federal Rules of Civil Procedure, Saul "is automatically substituted as a party."  Fed. R. Civ. P. 25(d).  The Clerk is hereby **DIRECTED** to amend the case style to reflect the substitution.

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entries dated 2/24/2020 & 2/25/2020).  Therefore, this Order constitutes a final Order of the Court.

under the Social Security Act.[3]  For the reasons set forth below, the Court **REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.  **PROCEDURAL HISTORY**

Plaintiff filed an application for DIB on June 22, 2015, alleging disability commencing on June 20, 2014.  [Record (hereinafter "R") 292].  Plaintiff's application was denied initially and on reconsideration.  [R91, 104].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R162-63].  An evidentiary hearing was held on January 31, 2018.  [R59-90].  The ALJ issued a decision on February 21, 2018, denying Plaintiff's application on the ground that

---

[3]      Title II of the Social Security Act provides for federal DIB. 42 U.S.C. § 401 et seq.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq., provides for Supplemental Security Income Benefits for the disabled ("SSI").  Unlike DIB claims, SSI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Thus, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

she had not been under a "disability" at any time from the alleged onset date through the date of the decision. [R123-43]. Plaintiff sought review by the Appeals Council, and on May 4, 2018, the Appeals Council remanded the case because the ALJ had based his credibility finding on a rescinded Social Security Ruling ("SSR").[4] [R144-47].

A second evidentiary hearing was held on December 13, 2018, wherein Plaintiff amended her alleged onset date to January 1, 2016. [R36-58]. The ALJ issued a second decision on January 3, 2019, again denying Plaintiff's application on the ground that she had not been under a "disability" at any time through the date of the decision. [R15-35]. Plaintiff again sought review by the Appeals

---

[4]    Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process. *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330, 338-39 (S.D.N.Y. 2001); *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)). Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

Council, and on June 10, 2019, the Appeals Council issued an unfavorable decision, making the Appeals Council's decision the final decision of the Commissioner. [R1-9].

Plaintiff then initiated this lawsuit on August 6, 2019, seeking review of the Commissioner's decision.  [Doc. 1].  The answer and transcript were filed on November 26, 2019.  [Docs. 7, 8].  On January 9, 2020, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 11]; on February 10, 2020, the Commissioner filed a response in support of the decision, [Doc. 12]; and on February 24, 2020, Plaintiff filed a reply brief in support of her petition for review of the Commissioner's decision, [Doc. 13].  The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs,[5] and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    <u>STANDARD FOR DETERMINING DISABILITY</u>

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not

---

[5]      Neither party requested oral argument.  (*See* Dkt.).

4

less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. 20 C.F.R. § 404.1512(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *superseded by* SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000), *on other grounds as stated in Washington v. Comm'r of Soc. Sec*., 906 F.3d 1353, 1360-61 (11th Cir. 2018). The claimant must prove at step one that he is not undertaking substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that

significantly limits his ability to perform basic work-related activities. 20 C.F.R. § 404.1520(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).   At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity ("RFC"), age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work.  20 C.F.R. § 404.1520(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. 20 C.F.R. § 404.1520(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial

gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## III.   <u>SCOPE OF JUDICIAL REVIEW</u>

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*,

804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the Commissioner's findings, the Commissioner's decision will not be overturned where "there is substantially supportive evidence" of the decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the Commissioner's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

IV.   **STATEMENT OF FACTS**[6]

A.   **Background**

Plaintiff was forty-nine years old as of the date of the ALJ's second decision. [R28, 292].  She had a seventh-grade education and worked as a quality supervisor making contact lenses from 1998 until June 20, 2014.  [R85, 342].  She alleged disability due to bilateral ulnar nerve decompression,[7] trigeminal neuralgia,[8] and depression.  [R341].

---

[6]   In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 11-13; *see also* Doc. 9 (Sched. Ord.) at 4 ("The issues before the Court are limited to the issues properly raised in the briefs.")].

[7]   Ulnar nerve decompression is an exploratory surgical procedure used to remove any compressive forces on the ulnar nerve—the nerve that is responsible for the funny-bone sensation—that are causing it to malfunction.  Damage to the nerve can lead to a permanent sensation of numbness or tingling similar to the funny-bone sensation and can also lead to loss of function in the muscles of the hand.   Univ. of Rochester Med. Ctr., *Ulnar Nerve Decompression*, https://www.urmc.rochester.edu/neurosurgery/services/peripheral-nerve/ulnar-nerve-decompression.aspx (last visited 9/9/2020).

[8]   Trigeminal neuralgia is a type of chronic pain that usually affects one side of the face.  The pain is extreme, with a sudden burning or shock-like sensation, and any vibration in the face—even talking—can set it off.  It is often caused by a blood vessel pressing on the trigeminal nerve, which is one of the largest nerves in the head.  The condition may come and go, disappearing for days or even months, but the longer a person has it, the less often it goes away.  MedlinePlus, *Trigeminal Neuralgia*,  https://medlineplus.gov/trigeminalneuralgia.html  (last  visited 9/9/2020).

## B.   Lay Testimony

In an adult function report dated August 10, 2015, Plaintiff reported that on a typical day, she would take medication and lie down in bed due to dizziness. [R351].  She stated that would watch television "a little" and walk around the house and yard for about five to ten minutes "to stay active."  [R351, 355].  She also reported that because of pain in both arms, she could lift only five pounds for less than one minute; she had difficulty reaching, grabbing, and using both hands; and her mother and daughter assisted her in the shower, combed her hair, and helped her dress.  [R351-52, 356].  She stated, however, that she was able to drive, go out alone, and shop for her medication refills at the pharmacy.  [R354].

## C.   Medical Records

Plaintiff first complained of upper-extremity pain to Al Rosenthal, M.D., at Plastic Surgery of Gwinnett, P.C., on March 14, 2013.  [R480].  She reported that she had originally developed pain in the right thumb, then developed a mass and started to have "triggering" of the thumb.  [R480].  She stated that the mass then spread over her wrist and that she subsequently developed pain that radiated up to her shoulder.  [R480].  A right-hand x-ray was normal.  [R485].  She was diagnosed

with triggering of the thumb with diffuse tenosynovitis,[9] given a steroid injection, and told to do non-repetitive light work at her job.  [R481, 484].

Plaintiff returned to Dr. Rosenthal on March 26, 2013, reporting no improvement from the steroid injection and still complaining of pain that radiated up and down her entire right arm, almost to the neck.  [R482].  Examination showed no improvement and some weakness and decreased range of motion, but Dr. Rosenthal did not see any triggering in the thumb.  [R482].  An MRI of the right wrist was unremarkable except for a small ganglion cyst.[10]  [R482, 486]. Dr. Rosenthal ordered a nerve study to rule out compressive neuropathy in the cervical region.  [R482].

---

[9]     Digital stenosing tenosynovitis (trigger finger) occurs when a finger or thumb becomes stuck in a bent position.  It occurs when a tendon sheath swells and becomes smaller, or when the tendon has a bump on it, causing the tendon to be unable to slide smoothly through the sheath and therefore become stuck. MedlinePlus, *Trigger Finger*, https://medlineplus.gov/ency/patientinstructions/000565.htm (last visited 9/9/2020).

[10]     A ganglion cyst is a sac filled with a jellylike fluid that originates from a tendon sheath or joint capsule, most often in the wrist, resulting in a benign soft-tissue knot-like mass that forms below the surface of the skin.  Foot Health Facts, *Ganglion Cyst*, https://www.foothealthfacts.org/conditions/ganglion-cyst (last visited 9/9/2020).

Neurologist Arthur Schiff, M.D., provided a neurological consultation on April 16, 2013. [R523]. Physical examination and a nerve conduction study were unremarkable, but given Plaintiff's neck discomfort, Dr. Schiff suspected that a component of cervical radiculopathy was present. [R489, 525]. He limited Plaintiff to occasional fifty-pound lifting, frequent twenty-five-pound lifting, and frequent overhead reaching on the right, secondary to possible underlying cervical disc herniation, and recommended an MRI scan of the cervical spine. [R525].

Plaintiff again followed up with Dr. Rosenthal on April 23, 2013. [R483]. He reviewed her nerve study and previous MRI and found them normal, except for the small ganglion cyst appearing on the MRI, and her examination was unremarkable. [R483]. He ordered the MRI recommended by Dr. Schiff. [R483].

On July 20, 2013, Plaintiff saw neurologist Badar H. Syed, M.D., at Gwinnett Neurology & Sleep Disorders Clinic for a nerve conduction study and electromyography. [R493]. Dr. Syed found that there was electrophysiological evidence of a demyelinating lesion across the bilateral ulnar grooves.[11] [R493].

---

[11]     Demyelination refers to loss or damage to the insulation around the nerve cells. Nat'l Multiple Sclerosis Soc'y, *Glossary*, https://www.nationalmssociety.org/Glossary (search Demyelinating Disorder, Demyelination) (last visited 9/9/2020). The ulnar groove is a fibro-osseous tunnel holding the ulnar nerve and its vascular accompaniment. Medscape, *What is the Role of the Epicondylar (Ulnar) Groove in the Anatomy of Ulnar Neuropathy?*,

He suggested a bilateral ulnar nerve transplant and counseled Plaintiff to avoid any repetitive trauma to her elbows.  [R493].

Plaintiff returned for follow-up with Dr. Syed on November 1, 2013. [R494-95].  She described constant numbness in her bilateral pinky and ring fingers. [R494].  It was also noted that Plaintiff had a history of left trigeminal neuralgia causing increased sensitivity to sound and intermittent left-sided facial breakthrough pain and was being treated with gabapentin [12] through "Dr. Rafique." [13]  [R494].  She reported that because the gabapentin made her drowsy, she only took it at night.  [R494].

Plaintiff had an independent medical evaluation ("IME") performed by orthopedist Michael A. Burke, M.D., in November 2013, in conjunction with a claim for worker's compensation.  [R497-500].  Dr. Burke's assessment was that she had chronic bilateral arm pain of unclear etiology and possible bilateral ulnar

---

https://www.medscape.com/answers/1141515-82612/what-is-the-role-of-the-epicondylar-ulnar-groove-in-the-anatomy-of-ulnar-neuropathy (last visited 9/9/2020).

[12]    Gabapentin is an anticonvulsant medication used to help relieve pain caused by nerve damage.  Mayo Clinic, *Anti-Seizure Medications: Relief from Nerve Pain*, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/in-depth/pain-medications/ART-20045004?p=1 (last visited 9/9/2020).

[13]    This appears to be a reference to treating physician Shahid Rafique, M.D.  [*See* R754-55, 765-69].

compression at the elbow but that her trigger thumb had improved.  [R499].  He opined that Plaintiff should be capable of working without restrictions but noted that a functional capacity evaluation ("FCE") could be performed to determine her functional capacity more objectively.  [R500].

Plaintiff was evaluated by orthopedist Waldo E. Floyd, III, M.D., at OrthoGeorgia on March 7, 2014.  [R511-12].  It was his opinion that the trigger thumb had resolved but that Plaintiff appeared to have "active bilateral cubital tunnel syndrome with 2 electrodiagnostic studies having demonstrated ulnar conduction delays across the elbow."  [R512].  He recommended cubital tunnel decompression.[14]  [R512].

---

[14]     Cubital tunnel syndrome is a condition that involves pressure or stretching of the ulnar nerve, which can cause numbness or tingling in the ring and small fingers, pain in the forearm, or weakness in the hand.  Am. Soc'y for Surgery of the Hand, *Cubital Tunnel Syndrome*, https://www.assh.org/handcare/condition/cubital-tunnel-syndrome (last visited 9/9/2020).  Cubital tunnel decompression is a surgical procedure by which the cubital tunnel (a groove in a bone near the elbow through which the ulnar nerve passes) is enlarged, thereby relieving pressure on the ulnar nerve.  Orthopaedic Ctr. of S. Ill., *Cubital Tunnel Syndrome & Decompression*, https://orthocenter-si.com/content/cubital-tunnel-syndrome-and-decompression (last visited 9/9/2020).

14

On July 2, 2014, Milan Patel, M.D., of Resurgens Orthopaedics, performed a right ulnar nerve decompression in July 2014, during which he confirmed a diagnosis of ulnar neuropathy at the elbow. [R595-96].

Notes from a follow-up appointment with Dr. Patel on September 11, 2014, indicate that Plaintiff had been attending physical therapy but did not experience improvement and complained of numbness, tingling, and pain that she rated at eight on a ten-point scale. [R566]. Dr. Patel observed that her range of motion was better but that she shook and paused with range of motion. [R566]. He recommended repeat electrodiagnostic studies to see the condition of her nerve and prescribed anti-inflammatory medication. [R566].

Electrodiagnostic studies made on November 13, 2014, showed a continued decrease in conduction velocity across the elbow and "actually seem[ed] to be worse than previous studies even prior to surgery." [R565].

Plaintiff returned to Dr. Schiff for reevaluation on November 13, 2014. [R531-32]. He noted that another neurologist had identified ulnar neuropathy for which Plaintiff had undergone ulnar nerve decompression surgery but that her pain and weakness worsened and she described "aching discomfort, weakness and pain

in the entire right upper extremity from the shoulder down, paresthesias[15] in digits 3, 4, and 5 of both hands, [and] weakness in the upper extremities and to some degree in the lower extremities." [R531]. He opined that her pattern of weakness and pain reported "goes beyond the distribution of the ulnar nerve," recommended an MRI scan of the cervical spine and a detailed rheumatological evaluation, and referred Plaintiff back to Dr. Patel for continued care. [R531-32].

Notes from return visits to Dr. Patel in January and February 2015 indicate that further right-arm surgery for ulnar nerve decompression and submuscular transposition was planned but that the surgery was cancelled because of Plaintiff's anxiety about it. [R563-64]. Plaintiff reported that her symptoms were the same and that she had radiating pain in her arm and numbness involving the small and ring fingers. [R563]. Dr. Patel diagnosed bilateral neuropathy, prescribed

_____

15      Paresthesias are burning or prickling sensations that are usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body. They are usually painless and described as tingling or numbness, skin crawling, or itching. Nat'l Instit. of Neurological Disorders & Stroke, *Paresthesia Info. Page*, https://www.ninds.nih.gov/Disorders/All-Disorders/Paresthesia-Information-Page (last visited 9/9/2020).

gabapentin and meloxicam,[16] and opined that Plaintiff still had a chance of getting better with surgery.  [R563].

In connection with her workers-compensation case, Plaintiff was sent for an FCE, which was performed at Physiotherapy Associates by Laurri Wallace, P.T., D.P.T., M.H.S., Cert. M.D.T., on April 10, 2015.[17]  [R536-46].  Dr. Wallace opined that although Plaintiff was unable to complete the majority of the activities, she gave a full and consistent effort and demonstrated appropriate pain behaviors; that Plaintiff was consistent in all activities in protecting both of her upper extremities, right greater than left; and that based upon significantly limited use of either upper extremity, Plaintiff was limited to less than sedentary work.  [R536-37, 545].

Plaintiff returned to Dr. Patel on April 21, 2015, for review of the FCE results. [R560].  Dr. Patel's notes from the visit indicate that he accepted the results of the

---

[16]    Meloxicam is in a class of medications called nonsteroidal anti-inflammatory drugs ("NSAIDs") and is often used to relieve pain, tenderness, swelling, and stiffness.  MedlinePlus, *Meloxicam*, https://medlineplus.gov/druginfo/meds/a601242.html (last visited 9/9/2020).

[17]    The initials following Dr. Wallace's name stand for Physical Therapist, Doctor of Physical Therapy, and Master of Health Sciences and indicate that Dr. Wallace holds a post-graduate certification in the McKenzie Method of mechanical diagnosis and therapy.  PT & Me, *Understanding Credentials*, https://ptandme.com/understanding-credentials/ (last visited 9/9/2020); Yale Sch. of Med., *Master of Health Sci. Degree Program for Dep't & Programs*, https://medicine.yale.edu/education/research/mhs/master/ (last visited 9/9/2020).

FCE as valid and therefore found that Plaintiff was limited to less than sedentary work.  [R561].

Plaintiff underwent a consultative psychological exam with Robert J. Storms, Ph.D., on November 2, 2015.  [R602-05].  Dr. Storms found that Plaintiff was polite, cooperative, straightforward, and matter-of-fact, and he noted that Plaintiff endorsed depression most days of the week and endorsed insomnia, a poor appetite, chronic fatigue, and feelings of worthlessness.  [R603-04].  He diagnosed major depressive disorder, recurrent, moderate, and assigned a GAF score of 50.[18]  [R604]. He opined that, from a mental perspective, Plaintiff could handle simple work, focus, get along with others, and tolerate normal job stress.  [R604-05].

A consultative physical examination was performed on November 13, 2015, by G.N. Kini, M.D.  [R608-14].  Manual dexterity was very slow, and grip was 1/5, but Dr. Kini found that this appeared to be mainly due to Plaintiff's failure to make any effort rather than true weakness.   [R609].   Dr. Kini also opined that the

---

[18]    The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000).  A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. at 34.

numbness and motor weakness Plaintiff complained of were not consistent with ulnar neuropathy; that her trigeminal neuralgia and depression had not been aggressively or adequately treated; that her symptoms may be due to a somatoform disorder [19] because of her depression; and that "[s]he need[ed] a psychiatric evaluation and treatment to help correct her other problems."  [R609].

On November 16, 2015, Plaintiff received a vocational assessment from Mike McCord, M.S., C.R.C., C.C.M., C.L.C.P., D./A.B.V.E.,[20] in connection with her workers-compensation case.  [R420-26].  Mr. McCord opined that, based upon the results of the FCE and Dr. Patel's opinion that Plaintiff could perform work within the restrictions delineated in the FCE, at less than the sedentary level, Plaintiff could not perform her previous job, there were no jobs for which Plaintiff was otherwise qualified that exist in significant numbers in the national economy,

---

[19]     Somatic symptom and related disorders are conditions in which the physical pain and symptoms a person feels are related to psychological factors and cannot be traced back to a specific physical cause.  People with somatoform disorders are not faking their symptoms; the pain they feel is real. Familydoctor.org, *Somatic Symptom and Related Disorders*, https://familydoctor.org/condition/somatic-symptom-and-related-disorders  (last visited 9/9/2020).

[20]     Mr. McCord is a Georgia Catastrophic Rehabilitation Supplier and a Diplomate of the American Board of Vocational Experts.  [R426].

19

and she therefore was "not able to perform competitive work on a full-time basis." [R425-26].

During a follow-up examination taking place on January 14, 2016, Dr. Patel noted that Plaintiff continued to report decreased sensation in the ulnar nerve distribution. [R615]. He also observed continued limited motion of the elbow with guarding. [R615].

On April 14, 2016, Thomas McIntyre, Ph. D., reviewed the record and opined that Plaintiff appeared capable of understanding, remembering, and carrying out short and simple instructions; could maintain attention and concentration adequately for two-hour periods within an eight-hour workday; could complete a normal work week without excessive interruptions from psychological symptoms; could interact appropriately with coworkers and supervisors on a limited basis; and could adapt to gradual changes in a work setting. [R118-20].

Plaintiff underwent a rheumatological evaluation with Faryal Umer Baloch, M.D., on July 11, 2016. [R716-19]. Plaintiff refused to move her arms and shoulders, "reporting severe pain even on touch," and Dr. Baloch therefore found it very difficult to assess her condition. [R716-19].

At a follow-up appointment taking place on August 2, 2016, Dr. Patel noted that Plaintiff continued to report pain in both arms, with the pain on the right side

20

radiating from the shoulder to the fingers and pain on the left side from the elbow into the fingers.  [R759].  On examination, Plaintiff exhibited decreased sensation in the ulnar distribution.  [R759].  Dr. Patel indicated that Plaintiff's work status was "as per FCE."  [R764].

On August 9, 2016, Shakoora Omonuwa, M.D., reviewed the record and opined that Plaintiff was capable of occasionally lifting or carrying fifty pounds; frequently lifting or carrying twenty-five pounds; standing or walking six hours in an eight-hour workday; sitting six hours in an eight-hour workday; and frequent handling and fingering in both hands.  [R116-18].

Shahid Rafique, M.D., completed a pain questionnaire on October 19, 2017.  [R754-55].  He reported that he had first examined Plaintiff in 2013, that he saw her once or twice per year, and that he was "seeing her after almost one year."  [R754].  He noted that Plaintiff was "guarding right arm/hand" and that he observed tremors in Plaintiff's right arm and right hand when he moved or handled them.  [R754].   He opined that Plaintiff was suffering from constant and severe neuropathic pain in both upper limbs and was credible regarding the severity, duration, and frequency of her pain; that she could not use her right hand or arm; that she would reasonably be expected to be off-task for at least fifteen percent of the workday and to miss two or more days of work per month due to her pain; and

that her depression psychologically limited her ability to work, secondary to her pain.  [R754-55].

On December 14, 2017, Plaintiff saw Dr. Rafique at DeKalb Medical Physicians Group for follow-up of pain and weakness in both arms, depression, and trigeminal neuralgia.  [R765-68].  Plaintiff reported that the pain and weakness in her arms and hands was unchanged; that her trigeminal neuralgia gave her a constant low-grade pain on the left side of her face with several acute exacerbations during the day; that she suffered from fatigue and insomnia; and that gabapentin helped only marginally and did not help her sleep.  [R765-66].  On examination, Dr. Rafique found that Plaintiff appeared alert and in pain.  [R767].  He also noted that Plaintiff was unable to grasp by two fingers in either hand but found that the weakness in the hands was disproportionate to the bulk of the muscles in the hand and the lack of atrophy.  [R767].  He assessed trigeminal neuralgia of the left side of the face, ulnar nerve entrapment, failed ulnar decompression surgery, weakness of the hand, a moderate episode of recurrent major depression, and neuropathic pain, and he increased Plaintiff's gabapentin.  [R767].

Plaintiff returned to Dr. Rafique on April 16, 2018, for follow-up of pain in both arms, depression, trigeminal neuralgia, and elevated blood pressure.  [R769]. He opined that Plaintiff was suffering from neuropathic pain but noted that she had

22

no health coverage, indicated that he had nothing further to offer her, and suggested that she seek a second opinion from a neurologist at Emory.  [R769].  He additionally prescribed gabapentin for trigeminal neuralgia of the left side of the face, tramadol[21] for ulnar nerve entrapment, citalopram[22] for a moderate episode of recurrent major depressive disorder, and amlodipine[23] for essential hypertension, and he assessed weakness in both hands.  [R769].

### D.   Vocational-Expert Testimony

At the first hearing, a vocational expert ("VE") classified Plaintiff's past relevant work as a contact lens supervisor.  [R85].  At the second hearing, a VE testified that if a person of Plaintiff's age, education, and work experience was able to perform work at the light exertional level, further limited to only frequently

---

[21]    Tramadol is in a class of medications called opiate (narcotic) analgesics and is used to relieve moderate to moderately severe pain.  MedlinePlus, *Tramadol*, http://medlineplus.gov/druginfo/meds/a695011.html (last visited 9/9/2020).

[22]    Citalopram, commonly marketed under the brand name Celexa, is a selective serotonin reuptake inhibitor ("SSRI") used to treat depression. MedlinePlus, *Citalopram*, https://medlineplus.gov/druginfo/meds/a699001.html (last visited 9/9/2020).

[23]    Amlodipine is a calcium channel blocker that is used alone or in combination with other medications to treat high blood pressure and chest pain.  It lowers blood pressure by relaxing the blood vessels so that the heart does not need to pump as hard.  MedlinePlus, *Amlodipine*, https://medlineplus.gov/druginfo/meds/a692044.html (last visited 9/9/2020).

handling and fingering with the bilateral upper extremities; unskilled work, consisting of simple, routine, repetitive tasks; and only occasional or superficial interaction with the public, [R54], the person could perform work that existed within the national economy, such as housekeeping cleaner, shirt presser, and marker. [R55].

## V.    APPEALS COUNCIL'S FINDINGS

The Appeals Council made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since January 1, 2016, the amended alleged onset date.

2.    The claimant has the following severe impairments: mild ulnar neuropathy, trigeminal neuralgia and major depressive disorder, but does not have an impairment or combination of impairments which is listed in, or which is medically equal to an impairment listed in 20 CPR Part 404, Subpart P, Appendix 1.

3.    The claimant's combination of impairments results in the following limitations on her ability to perform work-related activities:  the claimant has the residual functional capacity to perform light work, except can only frequently handle and finger with the bilateral upper extremities, and is limited to unskilled work, consisting of simple, routine, repetitive tasks with only occasional or superficial interaction with the public.

4.    In view of the above limitations, the claimant has the residual functional capacity to perform a reduced range of work at the light exertional level.

5.    The claimant's alleged symptoms are not consistent with and supported by the evidence of record for the reasons identified in the body of this decision.

[6.]   The claimant was a younger individual at all times relevant to this decision.  The claimant has a limited education, is able to communicate in English, and has past relevant skilled work.

[7.]   If the claimant was capable of performing a full range of light work, Medical-Vocational Rule 202.18, Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2 would direct a finding of "not disabled."  Although the claimant's exertional and nonexertional impairments do not allow her to perform the full range of work at the light exertional level, using the above-cited Medical-Vocational Rules as a framework for decisionmaking, there are a significant number of jobs in the national economy which [s]he could perform.

[8.]   The claimant is not disabled as defined in the Social Security Act at any time from the amended alleged onset date of application date [sic] of January 1, 2016, through January 3, 2019, the date of the Administrative Law Judge's decision.

[R6-7].

In reaching these findings and conclusions, the Appeals Council adopted the findings and conclusions reached by the ALJ in the decision issued upon the second remand and further discussed the opinion of Mr. McCord.  The ALJ had explained in the decision that he had concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and

25

other evidence of record.  [R24].  First, he found that the records did not contain objective evidence supporting the severity of the limitations alleged:  while a nerve study following surgery showed worsening since April 2013, it did not indicate denervation or more widespread neuropathy, [R24, 617]; in medical notes, Plaintiff was usually observed to be in no acute distress, [R24-25, 615, 622, 623, 628, 630, 699, 703, 740, 742]; Dr. Kini noted that although Plaintiff's manual dexterity was assessed as very slow and her grip was 1/5, there was no muscle atrophy in the relevant regions and the numbness Plaintiff reported was not in the regions indicated in the nerve conduction study, [R25, 607-14, 715-42]; Plaintiff's reports that gabapentin helped her symptoms, combined with gaps in treatment, suggested that gabapentin kept her impairments from limiting her as much as she alleged, [R25, 615]; there were no notes that Plaintiff reported to her healthcare providers that the gabapentin caused extreme drowsiness, and in fact, in December 2017, she reported that the gabapentin did not help with sleep, [R25, 765-68]; April and October 2018 progress notes did not refer to medication side effects, [R25, 769-75]; treating physician Dr. Rafique concluded that the severity of the weakness in Plaintiff's hands was disproportional to the bulk of the muscles in her hands, [R25, 765-68]; and since her surgery, Plaintiff had been treated conservatively with medication and declined more surgery, [R25-26, 616, 775].  Next, the ALJ found

26

that Plaintiff's complaints of limitation were undermined by "a somewhat normal level of daily activity and interaction[,] . . . including driving a car, going out alone, shopping in stores, watching television, and spending time with family members." [R26, 395-403].  The ALJ additionally explained that he gave "great weight" to the opinion of reviewing physician Dr. Omonuwa because it was "generally consistent with the overall medical evidence of record."  [R26, 116-18].

The Appeals Council explained that it had assumed jurisdiction of the case because the ALJ's decision had neglected to address the opinion of Mr. McCord. [R4-5].  It gave the opinion no weight, however, as it determined that Mr. McCord had provided an impermissible medical opinion that Plaintiff was limited to a less-than-sedentary RFC and moreover that the impermissible medical opinion was "not supported by more recent and more relevant evidence of record ranging from 2016 to 2017," including a consultative examination performed on July 11, 2016, where Plaintiff had a normal range of motion and gait and no muscle atrophy in the upper extremities, [R5, 716-33]; treatment notes throughout 2016 and 2017 repeatedly noting that Plaintiff was in no acute distress, with medication being effective in addressing neuropathy pain in the upper extremities, [R5, 615-30, 699]; additional treatment notes from December 2017 indicating that Plaintiff had normal muscle tone in the upper extremities and that the decreased

strength she exhibited was out of proportion with the muscle tone in the hand, [R5, 765-68]; "a wide range of activities of daily living, such as driving, going out alone, shopping in stores, watching television, and spending time with family members," [R5, 395, 403]; and the state agency medical consultative opinion provided by Dr. Omonuwa on August 9, 2016, which did not endorse a sedentary exertional limitation. [R5, 117-18]. The Appeals Council therefore found no reason to disturb the ALJ's decision that Plaintiff could perform a reduced range of light work. [R5].

## VI.   CLAIMS OF ERROR

Plaintiff contends that the Appeals Council's decision is based upon errors of law and is lacking in substantial evidence. [Doc. 11 at 12-18]. Plaintiff first alleges that the Appeals Council erred in assigning no weight to the opinion of Mr. McCord because Mr. McCord did not proffer an impermissible medical opinion but rather stated vocational opinions based on the limitations stated in Dr. Wallace's opinion following the FCE and the opinion of Dr. Patel. [*Id*. at 12]. Next, she contends that the ALJ erred by failing to evaluate the opinions of Dr. Wallace, Dr. Patel, and Dr. Rafique, and that the state agency physicians who evaluated Dr. Wallace's FCE improperly disregarded her opinion. [*Id*. at 12-16]. Finally, Plaintiff suggests that the Commissioner improperly required objective

proof of her pain; overly relied on "a perceived lack of significant objective findings (such as atrophy)"; and was misleadingly selective in reciting Plaintiff's activities of daily living.  [*Id*. at 16-18].

After careful review of the arguments and the administrative record, the Court finds that Plaintiff has demonstrated reversible error.  The Court addresses the arguments below in logical order.

### A.   Medical Opinions

#### 1.   FCE and the Opinions of Dr. Wallace and Dr. Patel

Most persuasive to the Court is Plaintiff's argument that the Commissioner failed to evaluate both the opinion Dr. Wallace derived from the FCE she conducted and Dr. Patel's adoption of Dr. Wallace's opinion.  [Doc. 11 at 12-13].  Plaintiff concedes that Dr. Wallace was not a medical doctor or otherwise considered an "acceptable medical source" under the regulations but argues that her opinion should have been evaluated under 20 C.F.R. § 404.1527(f) (2012).[24]  [*Id*. at 12-13]. She further suggests that if the Commissioner had evaluated the FCE and Dr. Wallace's opinion under § 404.1527(f), he would have found them persuasive,

---

[24]    Although 20 C.F.R. § 404.1527 (2012) has been superseded, it remains applicable to cases filed prior to March 27, 2017.  20 C.F.R. § 404.1527 (2017).

based on Dr. Wallace's credentials as a doctor of physical therapy who specializes in conducting and evaluating FCEs; the supportive documentation included in the report; the relevance of the testing objective, which was to determine Plaintiff's abilities and limitations; Dr. Patel's concurrence with the opinion; and confirmation by courts in this district and others in this circuit that an FCE is the "gold standard" for assessing functionality.  [*Id.* at 12-15 (citing *Madison v. Greater Ga. Life Ins. Co.*, 225 F. Supp. 3d 1381, 1394-96 (N.D. Ga. 2016) (Jones, J.); *Moeller v. Guardian Life Ins. Co.*, No. 5:10-cv-457-Oc34TBS, 2011 WL 7981954, at *7 (M.D. Fla. Dec. 16, 2011); *Wise v. Hartford Life & Accident Ins. Co.*, 403 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (Story, J.); *Fick v. Metro. Life Ins. Co.*, 347 F. Supp. 2d 1271, 1280 (S.D. Fla. 2004); *Lake v. Hartford Life & Accident Ins. Co.*, 320 F. Supp. 2d 1240, 1249 (M.D. Fla. 2004))].  Plaintiff also argues that although the state agency physicians evaluated the FCE at the initial level, they improperly discounted it based on their baseless finding that the results obtained were not credible because Plaintiff put forth a poor effort.  [Doc. 11 at 15-16 (citing [R96-97, 743]); Doc. 13 at 2].

In response, the Commissioner simply notes that Dr. Wallace's opinion was among the evidence available to the reviewing physicians in August 2016; that the reviewing physicians opined that Plaintiff could perform a range of medium work;

and that the Appeals Council, adopting the ALJ, assigned "great weight" to the opinions of the reviewing physicians, albeit while concluding that Plaintiff was only capable of a limited range of light work. [Doc. 12 at 12-13 (citing [R116-20, 536-45])]. The response brief contains no mention of the FCE or Dr. Patel. [*See generally* Doc. 12].

In reply, Plaintiff points out that Dr. Wallace did not feel that Plaintiff put forth poor effort and that she indicated that the results were valid. [Doc. 13 at 2].

The Commissioner reversibly erred in his handling of the FCE and Dr. Wallace's and Dr. Patel's opinions. Under the regulations, the Commissioner must evaluate every medical opinion the Agency receives. 20 C.F.R. § 404.1527(c). The Commissioner must demonstrate good cause for giving less than substantial or considerable weight to the opinion of a treating physician. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). In deciding the weight to give to any medical opinion, the Commissioner must consider the examining relationship, the treatment relationship, the evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the source, and any other relevant factors the claimant raises that may tend to support or contradict the medical opinion. *Id.* § 404.1527(c)(1)-(6). Relevant opinions from medical sources who are not acceptable medical sources are also to be considered according to the same

factors. *Id*. § 404.1527(f)(1).  In certain cases, "[d]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source . . . may outweigh the medical opinion of an acceptable medical source."  *Id*.; *Elder S. v. Saul*, Civ. Action No. 1:18-CV-00753-LTW, 2019 WL 4744826, at *7 (N.D. Ga. Sept. 30, 2019) (Walker, M.J.); *Williams v. Astrue*, Civ. Action File No. 1:09-CV-02689, 2011 WL 1131328, at *13-14 (N.D. Ga. Mar. 28, 2011) (Baverman, M.J.).

Review of the ALJ's and Appeals Council's decisions reveals that Dr. Patel was never mentioned, [*see* R4-7, 18-28], and the only reference to the FCE or Dr. Wallace's opinion is an observation that "[t]reatment notes refer to a functional capacity evaluation with opinion [sic] that the claimant should not return to her regular job and should be considered less than sedentary work [sic] based on limited use of either extremity," [R23].  This was insufficient under § 404.1527. The FCE, having been conducted to determine Plaintiff's tolerance of work tasks, [R536], clearly was relevant to determining Plaintiff's residual functional capacity, and as Plaintiff points out, although an FCE is by no means dispositive, 20 C.F.R. § 404.1527(d) (reserving the ultimate disability decision to the Commissioner), courts in this circuit have repeatedly affirmed the value of an FCE

in determining an individual's capacity to return to work, *see, e.g.*, *Madison*, 225 F. Supp. 3d at 1395; *Moeller*, 2011 WL 7981954 at *7; *Wise*, 403 F. Supp. 2d at 1276; *Fick*, 347 F. Supp. 2d at 1280; *Lake*, 320 F. Supp. 2d at 1249.  Dr. Wallace appears to be appropriately specialized, as a doctor of physical therapy with a master's degree in health sciences and a post-graduate certification in mechanical diagnosis and therapy, [R536], and she supported her opinion with a review of Plaintiff's complaints, medical history, current medications, and activities of daily living, and detailed physical findings, including a musculoskeletal assessment, range-of-motion testing, strength testing, neurosensory testing, upper-extremity testing, and a psychometric evaluation, [R545].  She additionally supported her opinion that Plaintiff put forth a reasonable effort during testing with her observation that although "[m]uscle activation was not palpable in the flexors of the forearm, . . . activation was noted in the shoulder." [R542].  Neither the Commissioner nor Dr. Omonuwa, the state agency reviewer upon whom the Commissioner relied, considered these factors in discounting the FCE.  [*See* R4-7, 18-28, 117].  It also bears noting Dr. Patel's adoption of Dr. Wallace's findings suggests that they were well-founded, as Dr. Patel treated Plaintiff over a course of years, including performing her surgery, and is therefore presumed to have been familiar with her condition, [*see* R561, 563-64, 566, 595-96,

33

615, 759, 764], yet the Commissioner never mentioned Dr. Patel's opinion, much less supplied good cause for rejecting it.  [*See* R4-7, 18-28].

The opinions of Dr. Wallace and Dr. Patel were more restrictive than the RFC and the state agency reviewing opinion assigned "great weight" by the Commissioner in determining the RFC.  [*Compare* R7, 26, 116-17 *with* R536, 764]. The Court therefore cannot say that properly considered, the opinions would not have led the Commissioner to a more restrictive RFC that would preclude the representative occupations relied upon in determining that Plaintiff was capable of performing work available in the national economy.  The Court therefore concludes that the Commissioner reversibly erred in his consideration of the FCE and the opinions of Dr. Wallace and Dr. Patel pertaining to the FCE.

### 2.    The Opinion of Dr. Rafique

The errors the Commissioner made in failing to properly consider the FCE and the opinions of Dr. Wallace and Dr. Patel were further compounded by the failure to fully consider Dr. Rafique's opinions.  Plaintiff avers that "[t]he Appeals Council decision does not evaluate the opinion[] of . . . general practitioner Rafique," as required under 20 C.F.R. § 404.1527(c).  [Doc. 11 at 15].  She points out that in October 2017 Dr. Rafique stated in a pain questionnaire that, having treated Plaintiff for approximately four years and having most recently seen her after

34

almost one year, it was his opinion that Plaintiff was suffering from constant and severe neuropathic pain in both upper limbs; that Plaintiff was credible regarding the severity, duration, and frequency of her pain; that Plaintiff could not use her right hand and arm, would reasonably be expected to be off-task for at least fifteen percent of the work day, and would be expected to miss two or more days of work per month due to her pain; and would be psychologically limited in her ability to work because of her pain.  [*Id*. at 9 (citing [R754])].  Plaintiff also notes that Dr. Rafique opined after a follow-up examination in December 2017 that Plaintiff's symptoms were the same; that she had pain in her hands and was unable to grasp by two fingers in either hand; and that while the weakness of the hands was disproportionate to the bulk of the muscles in the hand and lack of atrophy, it was his impression that her ulnar decompression surgery had failed.  [Doc. 11 at 9-10 (citing [R765-67])].  Plaintiff additionally points out that Dr. Rafique's April 2018 examination stated that he felt Plaintiff was suffering from neuropathic pain, that he had nothing further to offer her, and that she should seek a second opinion from a neurologist at Emory.  [Doc. 11 at 10 (citing [R769])].

In response, the Commissioner argues that "contrary to Plaintiff's argument, the ALJ fully considered the treatment records of Shahid Rafique, M.D., who examined Plaintiff in December 2017 and noted the severity of Plaintiff's

complaints regarding weakness in her hands was disproportional to the muscle bulk in both hands." [Doc. 12 at 11 (citing [R23-24, 765-68])].

Notably, the Commissioner's response does not argue that the ALJ or the Appeals Council took into account the pain questionnaire completed by Dr. Rafique in October 2017. [*See generally*, Doc. 12]. Nor does it appear that the ALJ or the Appeals Council acknowledged the pain questionnaire, [R755], or stated with particularity the weight assigned to the opinions stated therein. [*See* R4-7, 18-28]. This was error, as the Commissioner is required to "state with particularity the weight he gave the different medical opinions and the reasons therefor." *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Also, absent a showing of good cause, an ALJ must give "substantial or considerable weight" to the medical opinion of a treating physician such as Dr. Rafique. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011); *see also* 20 C.F.R. § 404.1527(c); SSR 96-2p, 1996 WL 374188. [25]   Moreover, Dr. Rafique's opinion supports the FCE findings and the opinions of Dr. Wallace and Dr. Patel, at least to the extent that they opined that Plaintiff credibly claimed

_____

[25]   Although SSR 96-2p has been rescinded, it remains applicable to cases filed prior to March 27, 2017.  Corr. Not. of Rescission of Soc. Sec. Rulings, 96-2p, 96-5p, & 06-3p, 2017 WL 3928297 (Apr. 6, 2017); Not. of Rescission of Soc. Sec. Rulings, 96-2p, 96-5p, & 06-3p, 2017 WL 3928298 (Mar. 27, 2017).

constant and severe neuropathic pain in both upper limbs and would be unable to complete tasks requiring the use of her right hand and right arm. [*Compare* R754 *with* R539, 746, 764]. Thus, it was error for the Commissioner to fail to consider it.

### B.   Request for Remand for an Award of Benefits

Plaintiff requests that the decision of the Commissioner be reversed and that the matter be remanded for payment of benefits, arguing that such remand is appropriate under the circumstances because she has been through two hearings, both of which were found to be legally deficient by the Appeals Council; because the Appeals Council's determination is also based upon a significant error of law and is lacking in substantial evidence; and because her claim is supported by a "gold standard" objective FCE and the opinions of two treating physicians. [Doc. 11 at 18]. The Commissioner does not respond to the argument.

Under sentence four of 42 U.S.C. § 405(g), "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." As a result, this Court may reverse the Commissioner's final decision if it "is not supported by substantial evidence, or . . . the Commissioner . . . incorrectly applied the law relevant to the disability

37

claim." *Jackson v. Chater*, 99 F.3d 1086, 1091-92 (11th Cir. 1996). Courts generally reverse and remand for further proceedings when the ALJ has failed to apply the correct legal standards. *Bright-Jacobs v. Barnhart*, 386 F. Supp. 2d 1295, 1349 (N.D. Ga. 2004).

However, a court may also reverse and remand with instructions for the Commissioner to award benefits. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). A court's award of benefits is appropriate where "the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis*, 985 F.2d at 534. This means that if factual issues remain, a court cannot usurp the Commissioner's role in making a disability determination by awarding benefits. *See Boyd*, 704 F.2d at 1211.

While the FCE and the disregarded opinions Dr. Wallace, Dr. Patel, and Dr. Rafique do support Plaintiff's application for benefits, they are in tension with Dr. Kini's consultative opinion, [R609]; Dr. Omanuwa's reviewing opinion, [R116-18]; a nerve conduction study that did not indicate denervation or more widespread neuropathy, [R671]; notes indicating that the bulk of muscles in Plaintiff's hands was disproportionate to her claimed weakness, [R765-68]; and Plaintiff's admission that she could drive, go out alone, and shop in stores,

[R395-403].   Thus, the Court does not find that the cumulative effect of the evidence establishes disability without any doubt.   The matter is therefore due to be reversed and remanded for further consideration.

### C.   Remaining Allegations of Error

The opinion of Mr. McCord may also merit reconsideration upon remand. While it is not entirely clear, Plaintiff appears to argue that the Commissioner erred when he assigned Mr. McCord's opinion no weight because it was an impermissible medical opinion, when it was in fact a vocational opinion. [Doc. 11 at 12].  Review of the Mr. McCord's written assessment reveals that he in fact supplied both a medical opinion and a vocational opinion:  he stated that following review of Plaintiff's medical records and an interview with Plaintiff, he "established her residual functional work capacity based on the opinions of her treating physicians" and then determined that there were no jobs available in significant numbers for a person with that residual functional work capacity. [R420].

There is no indication that Mr. McCord had any medical credentials.  Thus, his finding after review of the medical records that Plaintiff was capable of less than a full spectrum of sedentary work was not entitled to any special consideration. *See Chapman v. Comm'r of Soc. Sec.*, 709 Fed. Appx. 992, 995

39

(11th Cir. Sept. 26, 2017) (holding that because a chiropractor is not an acceptable medical source, the ALJ did not err by failing to address the restrictions assigned by the claimant's chiropractor); *Sarria v. Comm'r of Soc. Sec.*, 579 Fed. Appx. 722, 724 (11th Cir. Aug. 28, 2014) (holding that ALJ had good cause to disregard student therapist's opinion because she was not an acceptable medical source). Accordingly, the Commissioner did not err by assigning no weight to Mr. McCord's opinion that Plaintiff could perform less than a full range of sedentary work.

Mr. McCord made clear, however, that the finding that Plaintiff's residual work capacity was "below sedentary" was based on the FCE and Dr. Patel's opinion that Plaintiff could return to work within the restriction delineated on the FCE, or at less than a sedentary exertional level, [R425], and the Appeals Council's decision not to assign any weight to Mr. McCord's opinion—both the medical and the vocational aspects—was grounded solely upon the Commissioner's finding that the record evidence showed that Plaintiff was in fact capable of a limited range of light work, [R5]. Therefore, the question of whether the Commissioner erred in assigning no weight to Mr. McCord's vocational opinion—that Plaintiff's previous job could not be performed at the less-than-sedentary level and that there were no less-than-sedentary jobs that exist in significant numbers in the national economy,

40

[R425-26]—turn on whether Plaintiff can show that the Commissioner reversibly erred in rejecting the opinions that Plaintiff was capable only of a less-than-full range of sedentary work.   As discussed above, Plaintiff has done so. *See supra* Part VI.A.   Thus, if upon proper consideration of the FCE and the opinions of Drs. Wallace, Patel, and Rafique, the Commissioner finds that Plaintiff is in fact only capable of a reduced range of sedentary work, it will also be necessary for the Commissioner to reconsider Mr. McCord's vocational opinion.

Because it is clear that the Commissioner reversibly erred in his consideration of the opinion evidence, the Court need not and does not reach Plaintiff's arguments that the Commissioner improperly required objective proof of pain or was misleadingly selective in his recitation of Plaintiff's activities of daily living.  [*See* Doc. 11 at 16-17].  Nevertheless, it will be incumbent upon the Commissioner to fairly evaluate the symptoms of pain and Plaintiff's activities of daily living in conjunction with the other evidence of record upon remand.

## VII.  <u>CONCLUSION</u>

In conclusion, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.

The Clerk is **DIRECTED** to enter final judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this 9th day of September, 2020.

**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**